*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVEON JAMAL THOMPSON,

        Defendant-Appellant.

UNPUBLISHED
September 23, 2025
9:29 AM

No. 360346
Saginaw Circuit Court
LC No. 18-045011-FC

Before: MALDONADO, P.J., and PATEL and N. P. HOOD, JJ.

PER CURIAM.

This case arises from the murder of Antonio Parham on January 27, 2018, outside Parham's home. Defendant was tried three times for Parham's murder and related firearms offenses. The first two trials ended with mistrial declarations because each jury was unable to reach a verdict. The jury in the third trial found defendant guilty of first-degree premeditated murder, MCL 750.316, two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, carrying a dangerous weapon with unlawful intent, MCL 750.226, and carrying a concealed weapon, MCL 750.227. Defendant was sentenced to life imprisonment without the possibility of parole (LWOP) for the first-degree premeditated murder conviction, two years' imprisonment for each of the felony-firearm convictions, and two to five years' imprisonment each for the carrying a dangerous weapon with unlawful intent and carrying a concealed weapon convictions.

Defendant appealed his convictions and sentence. Without ruling on defendant's claims, we remanded the case to the trial court for a *Ginther*[1] hearing to determine whether defendant was denied the effective assistance of counsel during his third trial. *People v Thompson*, unpublished

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-1-

order of the Court of Appeals, entered December 4, 2024 (Docket No. 360346). The trial court ruled that defendant was not denied effective assistance of counsel.

We affirm defendant's convictions and the trial court's order denying defendant's motion for new trial, but we vacate defendant's first-degree felony murder sentence and remand to the trial court for resentencing on his first-degree murder conviction in light of *People v Taylor*, ___ Mich ___; ___ NW3d ___ (2025) (Docket Nos. 166428 and 166654); slip op at 37-38, which held that it is unconstitutionally cruel or unusual punishment to impose a mandatory LWOP sentence on a defendant like the one in this case who was 20 years old when he committed the crime, without following the individualized sentencing procedures of MCL 769.25.

## I. BACKGROUND

The prosecution's theory was that defendant shot and killed Parham in retaliation for Parham having supposedly killed defendant's friend, Brandon Pennywell. Pennywell's mother, Lisa Curtis, testified that defendant admitted to her that he killed Parham. Defendant's DNA was found on a laser sight recovered from the murder scene. Curtis had loaned her vehicle, a black Dodge Charger, to defendant. Eyewitness testimony indicated that Parham was shot by someone who was inside a black Charger. Curtis also had given her gun to defendant. The type of gun Curtis gave defendant was consistent with the types of cartridge cases recovered from the murder scene and fired bullets recovered from Parham's body and clothing. A cell phone expert testified that a cell phone associated with defendant was in the vicinity of the murder at the time of the offense. Curtis testified that this was Pennywell's phone and that, before his death, he had given this phone to defendant.

Additionally, the murder occurred before the COVID-19 pandemic when mask-wearing became common. A Black male wearing a surgical mask was seen by a neighbor driving the black Charger near the murder scene. Defendant had recently been to the hospital for a contagious illness and had easy access to surgical masks at the hospital. He also was seen by Curtis and a police officer wearing a surgical mask in the days after the murder, and two surgical masks were found in defendant's home during the execution of a search warrant.

Text messages between Parham's phone number and the phone number associated with defendant (i.e., the number for the phone that Curtis testified Pennywell gave to defendant) reflected that Parham and defendant were about to meet in person in the minutes leading up to the murder. During his police interview, defendant admitted to certain communications with Parham that are consistent with certain text messages several days before the murder; however, defendant claimed that the communications occurred on Facebook Messenger rather than by text message. After two mistrials, the jury in a third trial convicted defendant, and he was sentenced to life imprisonment without the possibility of parole. Defendant appealed his convictions and sentence.

While his appeal was pending, defendant moved for new trial raising several claims, including ineffective assistance of counsel and prosecutorial misconduct. The trial court rejected defendant's arguments and denied his motion for new trial. Defendant then moved this Court to remand the case to the trial court for an evidentiary hearing, which we granted. On remand, the trial court held a *Ginther* hearing and subsequently denied defendant's motion for a new trial.

We now address defendant's issues from his original and supplemental appellate briefs, starting with his post-remand arguments.

## II. INEFFECTIVE ASSISTANCE REGARDING DNA EXPERT

Defendant asserts that defense counsel was ineffective at his third trial for failing to present the testimony of Dr. Julie Howenstine—the defense DNA expert who testified at the second trial—to counter the testimony of Nicole Graham—the prosecutor's DNA expert whose video-recorded testimony from the second trial was played at the third trial. Defendant further argues that defense counsel was ineffective for failing to adequately consult with Dr. Howenstine to learn the full extent of her opinions. We disagree.

Whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Findings of fact are reviewed for clear error, and questions of law are reviewed de novo. *Id*. "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

"To prove that his defense counsel was not effective, the defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (quotation marks, brackets, and citation omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). A "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

An attorney's decision whether to call an expert witness for the defense is presumed to be a matter of trial strategy. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). We "will not second-guess counsel on matters of trial strategy, nor [will we] assess counsel's competence with the benefit of hindsight." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). A reasonable trial strategy may consist of cross-examination of a prosecution witness in lieu of calling a defense expert. *People v Carll*, 322 Mich App 690, 702-703; 915 NW2d 387 (2018).

The record supports the trial court's conclusion that defendant failed to overcome the strong presumption that defense counsel's declination to call Dr. Howenstine as an expert witness at the third trial was a matter of reasonable trial strategy. At the *Ginther* hearing, defense counsel testified that he questioned Dr. Howenstine's commitment to the defense, in part due to her decades-long service for the Michigan State Police, and that he was not happy with Dr.

Howenstine's testimony at the second trial. Defense counsel testified that, at the end of Dr. Howenstine's direct examination at the second trial, she "said the prosecution could be right," which defense counsel did not expect to hear from his own expert. When defense counsel stipulated at the third trial to the admission of Graham's testimony from the second trial, he did not "consider reopening the door" of calling Dr. Howenstine to testify again. Defense counsel explained: "Well, I had the stip [sic], I knew that [Graham's] testimony wasn't going to change. I thought it was better to use the limitations that the prosecution had left the door open and argue from there." Defense counsel elaborated:

> In my experience, each time you try a case, the prosecutor learns something. And each time, in a subsequent trial, they're going to take steps to correct some of the things that . . . are apparent from the earlier trial.
>
> That . . . was true in this case with the testimony of Lisa Curtis. [The prosecutor] went to school. I didn't want him going to school on the DNA. I wanted to live with what I had from the second trial.

The prosecutor then asked:

> So just to be clear. Based on what Dr. Howenstine had testified at the second trial, you were making a strategic decision in the third trial to simply limit the testimony of Ms. Graham to testimony you already knew had occurred, and to, therefore, avoid opening the door with Dr. Howenstine in the third trial?

Defense counsel answered, "Yes."

Also, when cross-examining Graham during the second trial, defense counsel elicited testimony that reasonably could be viewed as helpful to the defense. For example, Graham stated that it is possible for a person's DNA to be on an object that the person has never touched. Graham opined that direct contact was the most likely explanation for defendant's DNA being on the laser sight, but she acknowledged that direct contact was not the only possible explanation. Graham also agreed that some people shed DNA more than others, and some people wash their hands less frequently than others. Defense counsel asked, "So with all of your expertise and experience and as hard as you've worked and worked on this case, you can't tell the jury whether [defendant] ever touched that gun site [sic: laser sight]; can you?" Graham answered: "No. I can only testify that the DNA's consistent with his [DNA] being on there, but not how it got there."

Defendant argues, however, that defense counsel's declination to call Dr. Howenstine at the third trial was not a reasonable strategy because defense counsel failed to adequately consult Dr. Howenstine and was therefore ignorant of the full extent of her opinions—including her belief that it was equally likely that defendant had not touched the laser sight and that sick people shed DNA more readily than healthy people. We are not persuaded.

Defense counsel has "the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). "[A]ny choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. (quotation marks

-4-

and citation omitted). Therefore, "a sound defense strategy cannot follow an incomplete investigation of the case when the decision to forgo further investigation was not supported by reasonable professional judgment." *Id*. at 55. Defense counsel may be found to have performed deficiently on the basis of inadequate preparation that resulted in counsel's ignorance of evidence that would have been substantially valuable to the defense. *People v Caballero*, 184 Mich App 636, 642; 459 NW2d 80 (1990).

We agree with the trial court's finding that defense counsel's consultation with Dr. Howenstine was appropriate and did not fall below an objective standard of reasonableness. At the *Ginther* hearing, Dr. Howenstine testified that she was not meeting in person with anyone during the pandemic in 2020, but that she and defense counsel conferred by telephone in October 2020, before the second trial. Their telephone conversation lasted less than one hour, but Dr. Howenstine testified that the amount of time she spent in consultation with defense counsel was consistent with the amount of time she spent in consultation with counsel in other comparable cases. There is nothing to indicate that the length of the consultation or the fact that it occurred by telephone prevented Dr. Howenstine from conveying to defense counsel pertinent information or opinions.

Indeed, Dr. Howenstine indicated at the *Ginther* hearing that she had adequate time to convey pertinent information to defense counsel during their phone consultation. Dr. Howenstine further testified that her role as an expert for the defense was to aid the defense in any way she could, including by providing pertinent information to defense counsel. Nevertheless, defense counsel testified at the *Ginther* hearing that he did not recall Dr. Howenstine telling him that there was a 50% chance that defendant's DNA could have ended up on the laser sight without defendant having touched it. Nor did defense counsel recall learning from Dr. Howenstine during his consultation with her that a sick person sheds DNA more readily than a healthy person and is more likely to have their DNA on an object they had never touched. We therefore agree with the trial court's conclusion that defense counsel's consultation with Dr. Howenstine did not fall below an objective standard of reasonableness.

### III. INEFFECTIVE ASSISTANCE REGARDING CELL PHONE EXPERT

Defendant makes several arguments that his defense counsel was ineffective regarding the testimony of the prosecutor's cell phone expert, Michigan State Police Detective Sergeant Randolph Khan. These arguments are without merit.

### A. SCOPE OF EXPERT OPINION

Defendant argues that defense counsel was ineffective for failing to object to testimony of Detective Khan that allegedly strayed beyond his recognized field of expertise in cell phones. We disagree.

"[T]he determination regarding the qualification of an expert and the admissibility of expert testimony is within the trial court's discretion." *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999). "[E]xpert testimony must be limited to opinions falling within the scope of the witness's knowledge, skill, experience, training, or education." *People v Unger*, 278 Mich

App 210, 251; 749 NW2d 272 (2008). "Consequently, an expert may not opine on matters outside his or her area of expertise." *Id.*

Detective Khan testified by stipulation "as an expert in cell phone technology, cell phone records and analysis, and mapping and plotting." During defense counsel's cross-examination about his view that only one person was using Pennywell's phone during the period before Parham's murder, Detective Khan was asked whether more than one person living in a home could use the same phone. Detective Khan responded: "I have four family members in my house, we have four different phones, and I don't use any of their phones. I use mine. They use theirs. I can't answer for everybody else." Defense counsel then asked, "Well, that's fortunate, but there are people that don't have that many phones; correct?" Detective Khan responded: "I don't know, because there's so many phones out there, and I do a lot of cases where people do have multiple phones. I can't answer who does or doesn't have phones at a specific house." In response to defense counsel's question whether it is common for people to have two phones—a phone that is left at home and a phone that is taken with them— Detective Khan testified that his cell phone was the only phone he had. Defendant argues that Detective Khan's testimony injected unscientific personal views that veered beyond his field of expertise and that defense counsel was ineffective for failing to object to this testimony.

Although Detective Khan made statements about his family's phone usage, his opinion that Pennywell's phone was used by only one person during the relevant time period was based on expert analysis of the phone's records throughout that period at issue. Detective Khan examined the records for patterns, such as frequency and location of usage, to determine if the same person was using the phone over time. Detective Khan then looked at the communications on the date of the homicide to see if there was any change in pattern or if the pattern was the same as before. In light of the pattern of outgoing communications and the amount of usage, Detective Khan concluded that the person using the phone on the date of the homicide was the same person who had been using it over the previous two-month period but that he was not absolutely certain. Therefore, Detective Khan's opinion that one person was using the phone during the time period examined was based on his expert analysis of the phone records rather than any unscientific personal views. His testimony regarding his analysis fell within the proper scope of his expertise. We will not find trial counsel to be ineffective where an objection would have been meritless or futile. *Head*, 323 Mich App at 539.

To the extent that Detective Khan's testimony regarding the phone practices of himself and his family briefly strayed beyond his recognized field of expertise, defense counsel testified at the *Ginther* hearing that he thought Detective Khan's testimony about his family's phone practices was "gratuitous" and "ludicrous." However, defense counsel explained why he did not object:

> But, you know, that came out, and you're thinking on your feet in a trial. It was already in front of the jury. I thought, you know, if I objected and got it stricken technically because it was not a part of his expertise, that's fine, but the jury's already heard it. I would think it would be better to just let it go. I didn't think it hurt me at all. I thought it helped me.

Defense counsel further explained the strategic decision to refrain from raising an otherwise appropriate objection:

You don't want to stand up and object just to hear yourself talk, because you're interrupting things, you can be viewed as being objectionist [sic]. It could be used as trying to hide things from the jury. You could be viewed as just being disrespectful.

And, you know, the judge will instruct juries that lawyers may object from time to time and you should ignore that, but that's not the way it works in the real world. You only want to object when you've got something that you—the judge is going to give you some respect in that you're doing your job as a defense attorney to make sure your client gets a fair trial. If it's not something that goes to those issues, then you probably should keep your mouth shut.

We therefore conclude that the trial court did not err by finding that defense counsel's declination to object to Dr. Khan's references to his family phone use was not constitutionally deficient. See *Trakhtenberg*, 493 Mich at 52.

## B. POWERPOINT SLIDES

Defendant next argues that defense counsel was ineffective for failing to object to certain PowerPoint slides that were shown to the jury as a visual aid during Detective Khan's testimony. We disagree.

Some of the slides contained headings that listed defendant's name next to the phone number for Pennywell's phone. During a discussion outside the presence of the jury before Detective Khan testified, the trial court sustained defense counsel's objection to the admission of the slides into evidence. During the *Ginther* hearing, defense counsel testified that, according to his recollection, the specific aspects of the slides to which he had objected were not shown to the jury. However, the trial court took judicial notice that the unredacted slides were, in fact, visible to the jury during Detective Khan's testimony, contrary to defense counsel's recollection. But the trial court concluded that defense counsel's mistake did not constitute ineffective assistance of counsel.

We agree with defendant's contention that there was no valid strategic reason not to object to the PowerPoint slides being shown to the jury with defendant's name next to Pennywell's phone number. There was persuasive evidence suggesting that the person who murdered Parham used Pennywell's cell phone to lure Parham outside under the guise of smoking marijuana together. Therefore, whether defendant was the phone's exclusive user was a major source of contention at the trial. The headings on the PowerPoint slides took for granted that the phone was defendant's, and it was a mistake for defense counsel to allow the use of a visual aid that could cause the jury to subconsciously accept that this phone number belonged to defendant.

Defense counsel's error notwithstanding, though, we agree with the trial court that defendant has not met his burden to establish a reasonable probability of a different outcome but for the alleged deficient performance. See *Randolph*, 502 Mich at 9. The PowerPoint slides were not the only—or even primary—indication of defendant's association with Pennywell's phone. Curtis testified that Pennywell gave his phone to defendant in 2017. This testimony was corroborated by circumstantial evidence, including some of the content of certain text messages

that indicated defendant was the person who was using Pennywell's phone to communicate with Parham. The trial court appropriately found:

> The evidence admitted at trial of Defendant's guilt was substantial. In addition to Lisa Curtis'[s] testimony that Defendant confessed to the murder, the prosecution presented cell phone records, DNA evidence, and eyewitness testimony, all of which incriminated Defendant and amply supported the jury's verdicts.

Moreover, the PowerPoint slides were not admitted into evidence, and the jury was instructed to base its verdict only on the admitted evidence. "Jurors are presumed to follow their instructions, and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted). Accordingly, then, defendant has not established the requirements for ineffective assistance of counsel.

## C. ALTERNATE PHONE USERS

Next, defendant argues that defense counsel was ineffective at the third trial in failing to elicit testimony that someone outside defendant's home could have been using Pennywell's phone. We disagree.

Although the cell phone records showed that Pennywell's phone primarily was using the cell tower closest to defendant's home over the seven-week period leading up to the murder, the records could not pinpoint the exact address from which the phone was being used. At the first trial, defense counsel elicited testimony that there was no way to know the address from which the calls and texts were placed and that Detective Kahn could not pinpoint a number of people whose homes used that cell tower. Implicit in this line of questioning was that a different household was using the phone number.

At the third trial, Detective Khan testified that the records indicated that "someone at or near" defendant's home address was using the phone. This time, defense counsel did not ask questions about the possibility that the phone number was being used by an unknown person at a different address. Instead, defense counsel emphasized that multiple people in defendant's household were using the phone. Defense counsel elicited testimony from Detective Khan acknowledging that there can be more than one user of a phone. Defense counsel further elicited testimony from Detective Khan admitting his lack of certainty that it was one person using the phone over the seven-week period. Detective Khan testified: "[I]t appears to me one person's using it, but again, can I say 100 percent? I can't. But that's what it appears to me, the same person used the phone the entire duration of the records." Defense counsel asked, "But you can't say for sure?" Detective Khan answered, "I cannot." Defense counsel's cross-examination thus conveyed to the jury that someone other than defendant could have been using Pennywell's phone. Defense counsel further pursued this theory during closing argument by stating:

> There were multiple users for that phone. That's why it's not conclusive. The phone is in a house. We have phone tower information that says the same tower had a great number of calls off that phone. One sector of that particular tower had more than the others, but those phone calls came around the clock, certainly indicating that others were using it.

There's no home number in that house. People can have more than one phone. People who want to communicate with me routinely give me two, three numbers to reach them, and all I get are recordings.

The actual evidence doesn't support the conclusion as to who had that phone on the 27th.

Counsel's decisions regarding the choice of theories to present are presumed to be sound exercises of trial strategy. See *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). The theory that defense counsel chose to pursue was that multiple members of defendant's household could have been sharing the phone and that there was no way to discern who was using it on the day of the murder. Counsel's decision to pursue this theory was reasonable, and the fact that this strategy ultimately proved unavailing "does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

First, given the other evidence presented at the trial, the idea that Pennywell's phone number was being used in a different home could be viewed as farfetched. Curtis testified that Pennywell gave the phone to defendant, there was no evidence suggesting an interruption in service to that phone number, and outgoing calls and texts were being sent to people, such as Parham, who were in defendant's social circle. The idea that Pennywell gave the phone to defendant who then shared it with others in his home could be perceived as more believable. Second, although defense counsel could have highlighted that both theories were possible, the jury could easily infer that defendant knew whether Pennywell's phone was being used by members of his household. Accordingly, presenting both theories, while a permissible strategy, could have undercut the defense's credibility.

Therefore, the trial court did not err by concluding that defendant failed to establish ineffective assistance of counsel arising from Detective Kahn's testimony.[2]

## IV. CUMULATIVE ERRORS

Defendant next argues that he was denied a fair trial by the cumulative effect of defense counsel's errors. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*.

Defendant asserts that the cumulative effect of defense counsel's alleged errors deprived defendant of a fair trial. As explained, though, defendant has failed to establish any instance of ineffective assistance on the part of defense counsel. Even if any errors occurred, defendant has

---

[2] We note that this issue of ineffective assistance was not part of this Court's remand order and was not addressed at the *Ginther* hearing. Therefore, we refer here to the trial court's pre-*Ginther* order denying defendant's motion for a new trial.

failed to demonstrate sufficient prejudice from the cumulative effect of multiple errors. Accordingly, there is no cumulative prejudicial effect requiring relief.

## V. JUDICIAL BIAS

Following the *Ginther* hearing, defendant argues that due process requires a different trial judge to be assigned to the case if the case is remanded for a new trial or resentencing. As discussed, defendant is not entitled to a new trial, but he is entitled to resentencing in light of *Taylor*. However, we determine that due process does not require that a different trial judge be assigned on remand.

To preserve a claim of judicial bias, a defendant must raise the issue in the trial court. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). As defendant concedes, he did not raise his claim of judicial bias in the trial court. Therefore, the issue is unpreserved. Because this issue is unpreserved, it is reviewed for plain error affecting substantial rights. *Id*. In general, to obtain relief under the plain-error test, a defendant must demonstrate that (1) an error occurred, (2), the error was plain, i.e., clear or obvious, and (3) the defendant was prejudiced, i.e., the error affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If those three requirements are satisfied, then reversal is warranted only if the error resulted in the conviction of an innocent defendant or seriously affected the fairness, integrity, or public reputation of the proceedings. *Id*. at 763-764.[3]

"Due process requires that an unbiased and impartial decision-maker hear and decide a case." *People v Loew*, 340 Mich App 100, 110-111; 985 NW2d 255 (2022) (quotation marks and citation omitted). MCR 2.003(C)(1) warrants judicial disqualification if a judge is biased or creates an appearance of impropriety. However, "[a] judge is presumed unbiased, and a defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *Loew*, 340 Mich App at 111 (quotation marks, brackets, and citation omitted). "Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Jackson*, 292 Mich App at 598 (quotation marks and citation omitted). Comments critical of the parties or of their counsel are generally insufficient to demonstrate bias. *Id*. "The mere fact that a judge ruled against a litigant, even if the rulings are later determined to be erroneous, is not sufficient to require disqualification or reassignment." *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009). In determining whether an appearance of impropriety exists, a court considers "whether the conduct would create in *reasonable minds* a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Okrie v Michigan*, 306 Mich App 445, 473; 857 NW2d 254 (2014) (quotation marks and citations omitted).

---

[3] Defendant argues that judicial bias is a structural error that results in the third *Carines* prong automatically being satisfied and creates a rebuttal presumption that the error seriously affected the fairness, integrity, or public reputation of the proceedings. Because we determine that defendant cannot establish the first *Carines* prong, it is unnecessary to consider the other prongs.

Defendant argues that the trial judge must be disqualified on the basis of the judge's conduct or comments before, during, and after the *Ginther* hearing. With respect to events before the *Ginther* hearing, defendant relies on a comment made by the judge at an April 10, 2023 hearing that was held regarding defendant's motion for new trial. After the parties presented their arguments on the motion, the trial judge stated, in relevant part:

> All right, you both have argued your positions. I'll take the matter under advisement and notify the parties of my decision in writing.

> But you both also realize I sat through all three trials, I heard all the testimony, saw all the exhibits three times, so nothing either of you can tell me can educate me as to what happened in this particular trial.

Defendant fails to explain specifically why he believes this comment demonstrates bias or otherwise requires disqualification. Indeed, the trial judge accurately noted his extensive familiarity with the case.

As for the trial judge's conduct during the *Ginther* hearing, defendant states that, while his appellate counsel was examining Dr. Howenstine, the trial judge characterized a question posed by defendant's appellate counsel as speculative:

> *Q*. During the October 2020 phone consultation, did [defense counsel] ever ask you for your opinion on the probability, as a percentage or a ratio, of whether [defendant] actually touched the laser [sight]?

> *A*. I don't recall him asking me that and—

> *Q*. Had—had [defense counsel]—

> *A*. I believe we discussed secondary transfer—I know we discussed secondary transfer at that time, so that's all I recall.

> *Q*. Had [defense counsel] inquired about this probability as a percentage or a ratio of [defendant] actually touching the laser [sight], what would your response have been?

> *The Court*: It's a speculative question.

> *The Witness*: That it was equally likely that he had touched it versus that he had not, and it was there by way of secondary transfer.

Defendant argues that the rules of evidence are more relaxed at a *Ginther* hearing than at a trial and further suggests that speculation is necessary when determining whether a failure to conduct an adequate investigation constituted ineffective assistance of counsel. Defendant also accuses the trial judge of assuming the prosecutor's role by objecting to a question posed by defendant's appellate counsel. We are not persuaded.

-11-

Defendant cites *People v Barbara*, 400 Mich 352, 359; 255 NW2d 171 (1977), abrogated in part on other grounds as recognized in *People v Rogers*, 335 Mich App 172, 198 (2020), for the proposition that "[l]ess formal evidentiary requirements are commonly found at the post-conviction motion [stage] . . . ." However, defendant does not explain how he believes the trial judge should have applied the rules of evidence under a "relaxed" standard. Also, although the trial judge noted the speculative nature of the question, Dr. Howenstine still was allowed to answer the question. Therefore, defendant has failed to establish that the trial judge's comments indicated bias or created an appearance of impropriety.

Defendant next complains about comments that the trial judge made while sustaining an objection by the prosecutor to a question posed by defendant's appellate counsel to Dr. Howenstine.[4] Defendant refers to the following exchange:

> *Q.* If called to testify at the third trial and asked about whether sick individuals shed DNA more readily, what would you have testified?
>
> *Mr. White* [*The Prosecutor*]: Your Honor, I'm going to object. We've already—
>
> *The Court*: Yes. Sustain the objection. Speculative in nature. What she would have done, didn't do, all speculative in nature.
>
> I've been waiting on your objection, Mr. White. Sustain the objection. Proceed.
>
> *Mr. Wright* [*Defendant's Appellate Counsel*]: No further questions, Your Honor.

Defendant fails to explain how the trial judge's comments indicate bias or otherwise require disqualification. The judge's agreement with the objection and the judge's indication that he was waiting for the prosecutor to object do not reflect bias or an appearance of impropriety.

Next, defendant complains that the trial judge spent more time examining Dr. Howenstine at the *Ginther* hearing than the prosecutor did and asserts that the trial judge's questions were similar to those that a prosecutor would ask in establishing that defense counsel was effective. By way of example, defendant quotes the following questions that the trial judge asked Dr. Howenstine:

- "In essence, is it your role to aid the defense in any way that you can?"

- "And you do that by providing pertinent information to defense counsel?"

---

[4] Defendant also asserts that the trial judge struck "the bench with the open palm of his hand" while expressing approval of the prosecutor's objection. However, this assertion is not supported in the transcript.

- "At the end of that conference, did you feel you'd conveyed enough pertinent information to [defense counsel]?"

Defendant also notes that the trial judge asked Dr. Howenstine if it was "unusual" that defense counsel did not ask her whether sick people shed DNA differently than healthy people.

The trial judge's questioning of Dr. Howenstine did not indicate bias or create an appearance of impropriety. Judges are permitted to question witnesses. MRE 614(b). The prosecutor's cross-examination was succinct, and the trial judge's examination was comparable in length. Also, the judicial questioning at issue occurred at a *Ginther* hearing, not in front of a jury at a trial, and the judge's questions appeared to reflect efforts to clarify Dr. Howenstine's testimony.

As for events occurring after the *Ginther* hearing, defendant points to certain aspects of the trial judge's April 9, 2025 opinion and order denying the motion for new trial. According to defendant, the trial judge ignored testimony elicited by defendant's appellate counsel and credited only testimony elicited by the prosecutor. Although the judge quoted and relied on certain testimony elicited by the prosecutor, this does not mean that the judge ignored testimony elicited by the defense. At the outset of his opinion, the trial judge stated that he "considered the testimony presented at the *Ginther* hearing . . . ." There is no basis to doubt that the judge did so.

Defendant further argues that the trial judge adopted inconsistent positions. Defendant notes that, at the third trial, the judge sustained defense counsel's objection to the admission of the PowerPoint slides into evidence but that, in the April 9, 2025 opinion, the judge found that defendant was not prejudiced by the slides being shown to the jury. We disagree that these positions are inconsistent. The judge made an evidentiary ruling at trial regarding the slides, which is distinct from an analysis of the prejudice prong of an ineffective-assistance claim. Accordingly, there was no bias or appearance of impropriety.

Defendant argues that the trial judge was biased in concluding that defense counsel was not ineffective for failing to object to what counsel viewed as "ludicrous" testimony by Detective Khan. As discussed, we agree with the trial court that defense counsel was not ineffective for declining to object to the testimony at issue. Therefore, the trial judge's ruling did not reflect bias or create an appearance of impropriety.

## VI. PROSECUTORIAL MISCONDUCT

Defendant argues that he was denied a fair and impartial trial on the basis of alleged instances of prosecutorial misconduct. He further argues that defense counsel was ineffective for failing to object to the alleged prosecutorial misconduct. We disagree.

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant did not contemporaneously object or request a curative instruction, so his issue of prosecutorial misconduct is unpreserved. In general, claims of prosecutorial misconduct are reviewed de novo. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). However, unpreserved claims of prosecutorial misconduct are reviewed for

plain error. *People v Evans*, 335 Mich App 76, 88; 966 NW2d 402 (2020). As previously noted, plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763 (citation omitted). Even if the three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763 (quotation marks, citation, and alteration omitted).

Defendant also argues that, to the extent that he failed to object to the allegedly improper conduct, defense counsel rendered ineffective assistance. "The standards for 'plain error' review and ineffective assistance of counsel are distinct, and therefore, a defendant can obtain relief for ineffective assistance of counsel even if he or she cannot demonstrate plain error." *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020).

"During a criminal trial, prosecutors serve truth and justice first. The job isn't just to win, but to win fairly, staying well within the rules." *People v Urbanski*, 348 Mich App 90, 101; 17 NW3d 430 (2023). Prosecutorial misconduct claims are reviewed on a case-by-case basis. *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017). "The test for prosecutorial misconduct is whether the defendant was deprived of a fair trial." *People v Orlewicz*, 293 Mich App 96, 106; 809 NW2d 194 (2011). "The cumulative effect of several minor errors may warrant reversal even where individual errors in the case would not. Reversal is warranted only if the effect of the errors was so seriously prejudicial that the defendant was denied a fair trial." *People v McLaughlin*, 258 Mich App 635, 649; 672 NW2d 860 (2003) (citation omitted). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citation omitted). Unpreserved claims of prosecutorial misconduct will not warrant reversal unless a curative instruction would have been insufficient to alleviate the harm caused by the misconduct. *Id.*

A. BODY-CAMERA FOOTAGE

Defendant argues that the prosecutor improperly appealed to the jury's sympathy by playing police body-camera footage showing Saginaw Police Sergeant Ian Wenger rendering aid to Parham after he had been shot. We disagree.

The prosecution presented graphic footage from the body camera of one of the responding officers that captured the officers' efforts to save Parham's life. In the video, the officer exits her vehicle and runs to Parham. Parham is seen lying motionless on the ground with his arms spread to the sides. Parham's torso is exposed because his shirt appears to have been cut open by the responding officers. While the officer walks around the scene, the video displays an image of Parham's motionless face in which his mouth and eyes are open. Parham is seen holding his cell phone, with his thumb on the screen, in a manner suggesting that he was using the phone when he was shot. Someone states that Parham has a "faint pulse," and the officer whose camera is being played alternates chest compressions with another officer. A third officer uses a valve mask to

supply artificial respirations while a portable defibrillator was prepared. The video was stopped before EMTs arrived to load defendant into an ambulance.

Defendant argues that the presentation of this video was an improper appeal for sympathy because the video went far beyond its purported purpose of establishing that Parham was holding his phone when he was shot. "The prosecutor may not inject issues into a trial that are broader than the defendant's guilt or innocence. The prosecutor commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *Lane*, 308 Mich App at 66. However, "[t]his is essentially an evidentiary issue framed as prosecutorial misconduct. A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Dobek*, 274 Mich App at 70.

Nevertheless, the trial court did not abuse its discretion by admitting the video. The admission of videotaped evidence is "closely analogous" to the admission of photographic evidence, and the same rules of admissibility apply to both forms of evidence, although the trial court must consider the differences between the two media when determining admissibility. *People v Barker*, 179 Mich App 702, 710; 446 NW2d 549 (1989).[5]

> [P]hotographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted. However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. [*Head*, 323 Mich App at 541 (quotation marks and citation omitted).]

"Photographs depicting the nature and extent of a victim's injuries may be probative of the defendant's mental state. Photographs also may be admitted to explain or corroborate testimony about the cause of the victim's death." *Id*. (citation omitted). "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995).

On the first day of the third trial, outside the presence of the jury, the prosecutor explained to the court the reasons for the video's admission:

> I think just the most important parts are it shows law enforcement responding to the homicide initially, that medical aid was administered by [Sergeant] Wenger, and then the portion where it shows Mr. Parham holding the phone that, ultimately,

---

[5]Although this Court is not required to follow cases decided before November 1, 1990, see MCR 7.215(J)(1), a published case decided by this Court "has precedential effect under the rule of stare decisis," MCR 7.215(C)(2). See also *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (stating that although this Court is not "strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990," those opinions are nonetheless "considered to be precedent and entitled to significantly greater deference than are unpublished cases.").

these messages are found on that phone. Those are the only two portions I can—you know, I feel I would need to play, if that's—if the [c]ourt feels that's appropriate.

While graphic, the video served those relevant purposes. The video depicts Parham's phone in his hand, which is relevant to the prosecution's theory is that Parham was texting defendant when he was shot. Defendant suggests that testimony from the responding officers could have established that Parham was holding his phone when they responded to the scene. However, juries are not required to rely solely on testimony. *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009). Rather, "[p]hotographs may properly be used to corroborate other evidence and are not excludable simply because they are cumulative of a witness's oral testimony." *Id*.

Defendant further suggests that a still shot of the phone in defendant's hand would have achieved this purpose, but the video served other purposes as well. While defendant did not explicitly dispute that Parham was intentionally shot, "[i]t is well established in Michigan that all elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty." *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998). In general, a finding of intent to kill can be made more probable by the nature and extent of the injuries as depicted by video evidence. *Gayheart*, 285 Mich App at 228. In this case, the video provided evidence that Parham was shot, that the person who shot Parham intended to kill him, and that Parham died as a result of the gunshot wounds. Therefore, the trial court did not err by concluding that the probative value of the video was not outweighed by its graphic nature.

## B. REFERENCES TO PARHAM'S FAMILY

Defendant next argues that the prosecutor improperly appealed to the jury's sympathy by stating during closing argument that Parham's daughter never met her father. We agree that these comments were inappropriate, but we do not agree that they warrant reversal.

"Appeals to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). During closing arguments, the prosecutor made the following statements:

I believe that I referred to the victim in this case as Antonio Parham, and that's a mischaracterization on my part, because there's more than one victim here. Because you heard from one of the victims, Brenda Long. She's got a daughter. She's got a daughter who never met her father.

Mr. Parham had a family. It wasn't the defendant's right to take [Parham's] life. It wasn't the defendant's right to take [Parham] from his daughter, from [Long], from his family. Whatever he heard on the streets, that was not his right.

"The prosecutor commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *Lane*, 308 Mich App at 66. These comments were improper. The comments had nothing to do with defendant's guilt or innocence and their likely purpose was to generate sympathy for Parham's family. Still, reversal

is not warranted because defendant has failed to establish the requisite showing of prejudice. *See McLaughlin*, 258 Mich App at 649. This was a brief comment that did not relay any information that the jury did not already know as a result of admissible evidence. Moreover, any murder causes pain to the victims' families, so the comment added little. Finally, the court specifically instructed the jury not to allow sympathy to affect its judgment, "and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235. There was nothing remarkable about these comments that would overcome this presumption.

Regarding defendant's corresponding claim of ineffective assistance, defendant has failed to overcome the presumption that defense counsel's decision not to object was a valid exercise of trial strategy. There are situations when defense counsel may reasonably decide that "it is better not to object and draw attention to an improper comment." *Unger*, 278 Mich App at 242. This is especially true during closing arguments. *Id*. Given the relative brevity of these remarks, it was reasonable to allow the moment to pass rather than draw additional attention to the fact that Parham's daughter would never meet her father. Moreover, had defense counsel objected, the remedy would have been a curative instruction not to allow sympathy to affect its deliberations, and the jury was already going to receive such an instruction.

## C. DENIGRATION OF DEFENSE COUNSEL

Defendant next argues that the prosecutor improperly denigrated defense counsel during rebuttal closing argument. We disagree.

During rebuttal closing argument, the prosecutor discussed a defense theory suggesting that someone else had killed Parham and that defendant had been framed. The prosecutor stated:

> I mean let's go back to Garland Davis. He's a good friend with the defendant. What reason would Garland Davis want to kill Parham and then pin it onto—on [defendant]? So you're going to get revenge for [Pennywell's] murder by getting [defendant] with the finger pointed at him for committing it.
>
> Ladies and gentlemen, *this is asinine*. Lisa Curtis had no—absolutely no reason to tell the detectives that [defendant] admitted to killing Antonio Parham. She didn't have to tell them that. All she had to tell them was, well, he—I gave him the gun, I gave him the car. And that's it. That's all she needs to say.
>
> Why would someone threaten her, no, no, you need to tell them that it was [defendant] because we need to get this pinned on [defendant]. They already had [defendant] as the suspect. Garland Davis wasn't the suspect. She didn't need to do that. I mean, why would she tell them that? She told the detectives that the defendant admitted to the killing because the defendant admitted to the killing.
>
> You know, I don't want to waste your time and go through all these points that [d]efendant made, but, honestly, *they're just ridiculous*. So DNA. Counsel's saying that DNA evidence, DNA analysis done in—when was it, 2019, isn't good for 2018? No. You heard testimony from Ms. Graham, it doesn't matter. They

-17-

could have sent it in yesterday and they still could have analyzed it. [Emphasis added.]

Later, after further discussion of what the evidence at trial showed, the prosecutor stated:

So I'm just going to stop there. The evidence is clear, once again, okay? There's absolutely no foundation, no basis to any argument that there was some kind of setup here, that there was some kind of other killer. *It's just asinine*. [Emphasis added.]

Defendant contends that these arguments were improper attacks against his attorney.

"The prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66. However, "[a] prosecutor cannot personally attack the defendant's trial attorney . . . ." *People v Kennebrew*, 220 Mich App 601, 607; 560 NW2d 354 (1996).

The prosecutor may not question defense counsel's veracity. When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence. Such an argument impermissibly shifts the focus from the evidence itself to the defense counsel's personality. [*Unger*, 278 Mich App at 236 (quotation marks and citation omitted).]

"[A] prosecutor's comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial. Furthermore, otherwise improper remarks by the prosecutor might not require reversal if they respond to issues raised by the defense." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). Further, "it is not improper for a prosecutor to comment on the weakness of a defense theory." *People v Clark*, 330 Mich App 392, 435; 948 NW2d 604 (2019).

The prosecutor's remarks were not improper. The prosecutor did not attack defense counsel personally or suggest that defense counsel was intentionally attempting to mislead the jury. While the prosecutor certainly used strong language, this language was directed only at defense counsel's *arguments*, not at defense counsel himself. The prosecutor never referred to defense counsel as "asinine" or "ridiculous," and it is not prosecutorial misconduct to use such strong language to refute arguments advanced by defendant. Therefore, defendant has failed to establish that the prosecutor impermissibly attacked defense counsel.

VII. DUE PROCESS

Defendant also argues is that he was denied due process because he was retried twice as a result of juries being unable to reach a verdict. We disagree.

To preserve a claim of constitutional error predicated on the right to due process, a party must raise the issue in the trial court. *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022). Defendant did not raise this issue below. Therefore, as defendant concedes on appeal,

-18-

this issue is not preserved. Unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 764.

The constitutional protections against double jeopardy did not bar retrying defendant after the juries in his first and second trials were unable to reach a verdict. *People v Aceval*, 282 Mich App 379, 392 n 6; 764 NW2d 285 (2009). "Retrial after a mistrial is not barred if the mistrial was the result of 'manifest necessity,' such as a hung jury, as was the case here." *Id*., citing *People v Lett*, 466 Mich 206, 217-218; 644 NW2d 743 (2002). Indeed, this point has been recognized by the United States Supreme Court for 200 years. See *Richardson v United States*, 468 US 317, 323-324; 104 S Ct 3081; 82 L Ed 2d 242 (1984) ("It has been established for 160 years, since the opinion of Justice Story in *United States v Perez*, 22 US (9 Wheat) 579; 6 L Ed 165 (1824), that a failure of the jury to agree on a verdict was an instance of 'manifest necessity' which permitted a trial judge to terminate the first trial and retry the defendant, because the ends of public justice would otherwise be defeated.") (some quotation marks and citation omitted). The Michigan Supreme Court has reached the same conclusion. See *People v Thompson*, 424 Mich 118, 128; 379 NW2d 49 (1985) ("[W]e have consistently held that retrial after a mistrial caused by jury deadlock does not violate the Michigan Constitution or the United States Constitution.").

Defendant seeks to frame his argument as being predicated on the constitutional guarantees of due process rather than double jeopardy protections. However, our Supreme Court has rejected such due process claims. In *Thompson*, 424 Mich at 131, the defendant argued that holding a third trial after a jury deadlocked in the second trial violated his state and federal constitutional rights to due process. The defendant's first trial resulted in a conviction that was later overturned on appeal because of improper jury instructions. *Id*. The second trial ended in a mistrial because the jury was unable to agree on a verdict. *Id*. at 132. The jury in the third trial found the defendant guilty. *Id*. Our Supreme Court stated that it was "not aware of any United States Supreme Court decision holding that retrial following a properly declared hung jury mistrial violates the federal Due Process Clause." *Id*. at 132-133. Similarly, our Supreme Court had "never held that such a retrial violates the Const 1963, art 1, § 17 guarantee that no person may 'be deprived of life, liberty, or property, without due process of law.'" *Id*. at 133. Our Supreme Court in *Thompson* concluded that, under the facts of that case, "fundamental fairness was not abridged by the retrial." *Id*. "While there may be cases in which repeated retrials after repeated jury deadlock might be so fundamentally unfair as to violate the due process guaranteed by Const 1963, art 1, § 17, or the Fourteenth Amendment to the United States Constitution, this case is not one of them." *Id*. Also, although the defendant's accomplice testified for the prosecution at the third trial but not at the second trial, this did "not alter the fact that [the defendant] received the full benefits of due process of law." *Id*.

In *People v Sierb*, 456 Mich 519, 520-521; 581 NW2d 219 (1998), our Supreme Court held that state and federal due process guarantees did not bar a retrial following the second declaration of a mistrial arising from the inability of juries to reach a verdict. In that case, the defendant was tried twice, and a mistrial was declared in both trials because the jury in each trial was unable to reach a verdict. *Id*. at 521. The trial court then dismissed the charges on the ground that another retrial after two hung juries would violate the defendant's right to due process. *Id*. at 521-522. This Court affirmed the trial court's decision. *Id*. at 522. Our Supreme Court reversed and remanded the case to the trial court for further proceedings. *Id*. at 521, 534. Our Supreme Court in *Sierb* stated that "[t]he defendant has failed to distinguish between the Michigan and federal due

process provisions and has not argued that the Michigan provision should be interpreted differently from its federal counterpart." *Id*. at 523. The Court "interpret[ed] the state provision as coextensive with the federal provision for purposes of this appeal." *Id*. The Court explained, "Absent definitive differences in the text of the state and federal provision, common-law history that dictates different treatment, or other matters of particular state or local interest, courts should reject the unprincipled creation of state constitutional rights that exceed their federal counterparts." *Id*. (quotation marks and citation omitted).

The Court discerned no support for "the proposition that the protections of substantive due process require recognition of a remedy for the harm incident to one or more mistrials." *Id*. at 525. Our Supreme Court found it clear that the United States Supreme Court "will not rely on substantive due process to sanction new remedies that duplicate the protections of specific constitutional provisions." *Id*. at 527. The Court noted the lack of guidelines for applying any newly inferred remedy to bar retrial in this circumstance. *Id*. at 529-531. "If three trials are too many under substantive due process, why are not two? It could follow that either any retrial after a mistrial is barred as a violation of substantive due process, or that the theory as applied would result in arbitrary assertion of judicial authority." *Id*. at 531. The Court explained that it had "cautiously responded to requests to recognize new remedies that would limit the authority of the executive or legislative branches of government." *Id*. By dismissing the case, the trial court had "violated the doctrine of separation of powers." *Id*. at 532. "The amorphous claim endorsed by the trial court and the Court of Appeals would inevitably call for courts to decide what policy of retrial is best for all the people of Michigan." *Id*. Our Supreme Court concluded:

> Finally, absent a violation of the constitution or specific statutory authority, we are not persuaded that we have the authority or the wisdom to monitor the performance of the elected prosecutor. Nor has the case been made that harm to an interest not addressed by specific provisions of the Bill of Rights requires a new remedy. Whatever the reach of substantive due process, this claim does not approach the threshold. In this context, we find no historical, textual, or empirical foundation that requires inferring a new remedy from the penumbras of substantive due process. [*Id*. at 533.]

Defendant's due process claim fails in light of *Thompson* and *Sierb*, in which our Supreme Court rejected the type of due process claim that defendant is asserting. Defendant attempts to distinguish *Sierb* by noting that he is arguing that the state due process provision should be interpreted more broadly than its federal counterpart. But defendant has failed to identify any "definitive differences in the text of the state and federal provision, common-law history that dictates different treatment, or other matters of particular state or local interest" that would justify creating a state constitutional right that exceeds the federal counterpart. *Id*. at 523. Defendant further suggests that a due process violation occurred because of differences in what evidence was presented at the third trial and one or both of the earlier trials. But defendant cites no authority that would support finding a due process violation on this basis, and defendant fails to address the fact that a similar situation existed in *Thompson*. In that case, the defendant's accomplice testified

for the prosecution at the third trial but not at the second trial,[6] but this did "not alter the fact that [the defendant] received the full benefits of due process of law." *Thompson*, 424 Mich at 133. Defendant has likewise been afforded the full benefits of due process of law.

## VIII. CONCLUSION

Defense counsel's assistance was not ineffective, so necessarily there was no cumulative effect of defense counsel's errors entitling defendant to relief. We therefore affirm the trial court's order denying defendant a new trial. The prosecutor did not engage in misconduct, and subjecting defendant to three trials did not violate his right to due process. Accordingly, we also affirm defendant's convictions. However, because defendant was 20 years old at the time of the instant offense and the trial court imposed a mandatory LWOP sentence, we vacate defendant's first-degree felony murder sentence and remand this matter for resentencing consistent with *Taylor*. On remand, due process does not require that a different trial judge be assigned. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Sima G. Patel

N. P. Hood, J., did not participate.

---

[6] The accomplice's testimony at the third trial in *Thompson* was highly incriminating for the defendant. The accomplice testified that the defendant "had planned the robbery, obtained the gun, and shot the victim during the robbery." *Thompson*, 424 Mich at 132. Nevertheless, the third trial was permitted.